ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No.305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 16th Street, Suite 204
Arcata, CA  95521
Tel: (707) 630-5061
Fax: (707) 630-5064
Email: wverick@igc.org

DAVID WILLIAMS (State Bar No. 144479)
Law Offices of David Williams
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94596
Tel: (510) 847-2356
Fax: (925) 332-0352
E-mail: dhwill7@gmail.com

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,  ) <br> ) <br> Plaintiff,  ) <br> ) <br> v.  ) <br> ) <br> SCHNEIDER DOCK & INTERMODAL FACILITY, INC. and RYAN SCHNEIDER,  ) <br> ) <br> Defendant.  ) | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

I.      **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Schneider Dock & Intermodal Facility, Inc., and Ryan Schneider ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On July 13, 2017, Plaintiff provided written notice to Defendants, via process server, of Defendants' violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1).  A true and correct copy the Notice Letter is attached hereto as **Exhibit A**, and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served the Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions

Complaint for Declaratory and Injunctive Relief and Civil Penalties

giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Humboldt County.

**II.**      **INTRODUCTION**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the 16-acre intermodal facility and dock ("the Facility") located at 990 W. Waterfront Drive in Eureka, California. Defendants discharge pollutant-contaminated storm water from the Facility into the Humboldt Bay. Humboldt Bay is a water of the United States within the meaning of the Clean Water Act.  Defendants are in violation of both the substantive and procedural requirements of the CWA.

6.      Defendants' discharges of polluted storm water from the Facility violate Section 301 of the Act, which prohibits the discharge of storm water associated with industrial activities to waters of the United States except in compliance with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  These violations are ongoing and continuous.

7.      Defendants' discharges of polluted storm water from the Facility violate the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 14-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the permitting, filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

8.      The failure on the part of industrial facility operators, such as Defendants, to apply for and comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Humboldt Bay.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the aquatic environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Humboldt Bay.

**III.**      **PARTIES**

9.      Defendant Schneider Dock & Intermodal Facility, Inc. is a California corporation doing business in California.

10.     Defendant Ryan Schneider is the Agent for Service of Process and Owner of Schneider Dock & Intermodal Facility, Inc.

11.     Defendants own and operate the Facility, an approximately 16-acre dock and storage facility located at 990 W. Waterfront Drive, Eureka, California.

12.     Defendants' primary industrial activities at the Facility include but are not limited to marine cargo handling, the storage and treatment of logs, the de-barking of logs, the storage and handling of soil amendments/bark, loading/unloading vessels via a dock, and the transfer of cargo between ships and trucks.

13.     Plaintiff CATs is a non-profit public benefit corporation organized under the laws of California, based in Arcata, California. CATs is dedicated to the defense of the environment from the effects of toxic chemicals, and the preservation and protection of the wildlife and natural resources of California waters, including the waters into which Defendants discharge polluted storm water. To further its goals, CATs actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

14.     Members of CATs, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Humboldt Bay, into which Defendants cause pollutants to be discharged. These members of CATs use and enjoy the Humboldt Bay for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes. Defendants' discharges of storm water containing pollutants impairs each of those uses. Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

15.     Members of CATs reside in California and use and enjoy California's numerous rivers for recreation and other activities. Members of CATs use and enjoy Humboldt Bay, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Members

of CATs use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities because that relief will significantly reduce pollution discharged from Defendants' Facility into the Humboldt Bay.

16.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.     LEGAL BACKGROUND

### A.     Clean Water Act

17.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

18.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits both discharges not in conformance with a NPDES permit, such as discharges without a NPDES permit issued pursuant to Section 402 of the Act (33 U.S.C. §1342) or discharges that violate the terms of an NPDES permit.

19.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

1    20.    A "point source" is defined as "any discernible, confined and discrete conveyance,

2 including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are

3 or may be discharged."  33 U.S.C. § 1362(14).

4    21.    "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).

5 Waters of the United States includes, among others things, waters that are, were, or are susceptible to

6 use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015). Section 402 of the

7 Act, 33 U.S.C. § 1342, establishes the NPDES program, a permitting program that regulates the

8 discharge of pollutants into waters of the United States.  Section 402(p) establishes a framework for

9 regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. §

10 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with

11 industrial activity.  *Id.* § 1342(p)(2)(B).  Section 402 authorizes states with approved NPDES permit

12 programs to regulate industrial storm water discharges, through individual permits issued to dischargers

13 and/or through the issuance of a single, statewide general permit applicable to all industrial storm water

14 dischargers.  33 U.S.C. § 1342(b).

15    22.    Section 505(a)(1) provides for citizen enforcement actions against any "person,"

16 including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES

17 permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing

18 actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f)

19 (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section

20 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

21    23.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).

22 Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for

23 violations occurring after January 12, 2009, and up to $51,570 per day per violation for all violations

24 occurring after November 2, 2015 pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d),

25 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

26    **B.    State Regulations**

27    24.    The Act requires States to promulgate water quality standards.  *See* 33 U.S.C. §§ 1313(a)-

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

(c).  Water quality standards consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses.  33 U.S.C. § 1313(c)(2)(A).  The Act requires States to assess whether these water quality standards are being met.

25.    The Humboldt Bay is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board, and the Regional Board, which has placed the waterbody on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the North Coast Region (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as aluminum, arsenic, cadmium, chromium, lead, mercury, nitrate, endrin, benzene, 1,2-dibromo-3-chloropropane, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, heptachlor, and 1,1,2,2-tetrachloroethane.

26.    In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to the Humboldt Bay, and includes limits for several toxic metals, including antimony, arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, thallium, and zinc.

## C.    California Industrial Storm Water General Permit

27.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits in California, including general NPDES permits.

28.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

29.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

30.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

31.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

32.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

33.     Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.

34.     Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.

35.     Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

36.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology

1   Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

2   Pollutant Control Technology ("BCT") for conventional pollutants.

3        37.    EPA has established Benchmark Levels as guidelines for determining whether a facility

4   discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg.

5   64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants

6   discharged by Defendants: Total Suspended Solids ("TSS") – 100 mg/L; Oil & Grease ("O&G") – 15.0

7   mg/L; Iron – 1.0 mg/L; Aluminum – 0.75 mg/L; Zinc - .117 mg/L (hardness dependent); Copper –

8   0.0636 mg/L; Arsenic – 0.16854; Nitrate plus Nitrite Nitrogen – 0.68 mg/L; pH – 6.0-9.0 s.u.;

9   Phosphorus – 2.0 mg/L; and, Chemical Oxygen Demand ("COD") – 120 mg/L.

10        38.    The Regional Board has established water quality standards for the Humboldt Bay in the

11   Basin Plan.

12        39.    The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be

13   maintained free of toxic substances in concentrations that are toxic to or that produce detrimental

14   physiological responses in, human, plant, animal, or aquatic life."  3-4.00 Basin Plan.

15        40.    The Basin Plan provides that "[w]aters designated for use as domestic or municipal supply

16   (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in [22

17   C.C.R. §§ 64435 and 64444.5]."  3-5.00 Basin Plan.  The Humboldt Bay is impaired for Dioxins and

18   Polychlorinated biphenyls.

19        41.    EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic

20   pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following

21   applicable numeric limits for saltwater surface waters:  Zinc - .09 mg/L; Copper – 0.0048 mg/L; and,

22   Arsenic – 0.069 mg/L.

23        42.    The General Permit requires dischargers to develop and implement a site-specific

24   SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the

25   facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description

26   of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7)

27   advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

43.    Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

44.    Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

45.    Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

46.    Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

47.    The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

48.    The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly

Complaint for Declaratory and Injunctive Relief and Civil Penalties

visual observations of each drainage area, as well as visual observations during discharge sampling events. General Permit, Section XI.A.1 and 2. Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment. General Permit, Section XI.B.6.

49.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. Section XI.B.11. Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit. General Permit, Section XII. An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value. General Permit, Section XII.A.1. An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value. General Permit, Section XII.A.2. If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C. The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status. If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

50.     Dischargers must submit an Annual Report no later than July 15th following each reporting year, certifying compliance with the General Permit and/or an explanation for any non-compliance. General Permit, Section XVI.

## V.     STATEMENT OF FACTS

51.  The Facility is an approximately 16-acre dock and intermodal facility. A site map of the Facility is attached as **Exhibit B**. Defendants' primary industrial activities at the Facility include marine

Complaint for Declaratory and Injunctive Relief and Civil Penalties

cargo handling, the storage and treatment of logs, de-barking of logs, the storage and handling of soil amendments and bark, the loading and unloading of vessels via a dock, and the transfer of cargo between ships and trucks.  Most of these industrial activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls.

52. The primary industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 4491 ("Water Transportation") 2421 ("Sawmills & Planing Mills"), 4214 ("Local Trucking With Storage") and 2875 ("Fertilizer").

53. Additionally, the Facility's wood treating activities at the Facility are described under a secondary SIC Code, 2491 ("Wood Preserving").

54. Defendants collect and discharges storm water associated with industrial activities at the Facility through at least 4 discharge points into the Humboldt Bay.  Humboldt Bay is a water of the United States within the meaning of the Clean Water Act.

55. On information and belief, Defendants submitted a Notice of Intent to comply with the General Permit on or about January 26, 2015.  The Facility was assigned the WDID number 1 12I016326.

56. Defendants submitted another Notice of Intent to comply with the General Permit on or about January 3, 2017.

57. Defendants filed a SWPPP, as required by the General Permit, with the Regional Board.

58. Under the General Permit, Defendants have continually sampled storm water discharges from the Facility and found levels of pollutants in the samples that exceeded on various occasions EPA's benchmarks.  This information was reported to the Regional Board, as required by the General Permit.

59. According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measured discharges containing levels of TSS, and pH in excess of the EPA Benchmark Values on at least six (6) occasions since July 13, 2012.

60. Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit limitations constitute "conclusive evidence" of violations of the permit and the Act.  *Sierra Club v.*

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1  *Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853
2  F.2d 667.

3      61. Plaintiff is informed and believes, and thereupon alleges, that since at least January 16, 2001,
4  Defendants have consistently discharged storm water and non-storm water containing impermissible
5  levels of TSS, O&G, Zinc, and COD and other pollutants associated with Defendants' industrial
6  operations into the waters of Humboldt Bay, without complying with the terms of the General Permit.

7      62. According to Defendants' self-monitoring reports, since at least July 13, 2012, Defendants
8  have known that storm water discharged from the Facility contains concentrations of: TSS in excess of
9  EPA Benchmark Value of 100 mg/L and pH outside of EPA Benchmark range of 6.0-9.0 mg/L.

10      63. On at least two (2) documented occasions since July 13, 2012, the levels of TSS detected by
11  Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 100 mg/L
12  for TSS.

13      64. On at least four (4) documented occasions since July 13, 2012, the levels of pH detected by
14  Defendants in the storm water discharged from its Facility fell outside the Benchmark range of 6.0-9.0
15  mg/L for pH.

16      65. The Facility's exceedances of EPA Benchmarks provided above indicate that Defendants
17  have not implemented BAT and BCT at the Facility for its discharges of TSS and pH.

18      66. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any
19  exist, fail to achieve BAT and BCT standards.

20      67. The management practices at the Facility are wholly inadequate to prevent the sources of
21  contamination described above from causing the discharge of pollutants to waters of the United States
22  and fail to meet BAT and BCT standards.

23      68. Information available to Plaintiff indicates that as a result of these practices, storm water
24  containing pollutants harmful to fish, plant and bird life, and human health are being discharged from
25  the Facility directly to the Humboldt Bay during significant rain events.

26      69. Information available to Plaintiff indicates that Defendants have not fulfilled the
27  requirements set forth in the General Permit for discharges from the Facility due to the continued

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

discharge of contaminated storm water.

70. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

71. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to monitor all of the storm water outfalls at the Facility, as required by the Permit.  Defendants' SWPPP does not require or allow Defendants to take representative samples in lieu of sampling all outfalls.  Defendants' failure to designate, and take samples from, every Facility discharge point is a violation of the Permit.

72. Plaintiff is informed and believes, and thereupon alleges, that significant materials associated with past industrial activity, including pentachlorophenol and dioxins, remain at the Facility.  During storm events, these pollutants mix with storm water and are transported, through a series of conveyances, to discharge into the Humboldt Bay.

73. Plaintiff is informed and believes, and thereupon alleges, that Defendants have used testing method EPA 200.7 for analyzing storm water samples for zinc.

74. Plaintiff is informed and believes, and thereupon alleges, that Defendants have used testing method EPA 1644B for analyzing storm water samples for oil and grease.

75. Plaintiff is informed and believes, and thereupon alleges, that Defendants have used testing method HACH 8000 for analyzing storm water samples for chemical oxygen demand.

76. Plaintiff is informed and believes, and thereupon alleges, that Defendants have contributed to the impairment of the Humboldt Bay by discharging dioxins in excess of CTR levels – 0.000000013 mg/L.

77. Plaintiff is informed and believes, and thereupon alleges, that Defendants have reported two (2) instantaneous maximum Numeric Action Level ("NAL") exceedances for pH in the 2016 – 2017 reporting period.

78. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled

with adequate frequency, have not sampled all discharge points, have not analyzed the storm water samples collected at the Facility for all of the required pollutant parameters, and have not used the correct test methods to analyze their storm water samples.

79. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

80. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

81. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

82. Defendants have failed to develop and implement an adequate SWPPP for the Facility. Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the lack of specificity and detail required by the General Permit; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable standards.

83. Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.  General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to violate the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

84. Each day Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendanst have violated the act and are subject to civil penalties for each and every day since July 13, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## SECOND CLAIM FOR RELIEF

### Failure to Develop and Implement the Best Available And Best Conventional Treatment Technologies at the Facility (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

85. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

86. The General Permit's SWPPP requirements and Effluent Limitation V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

87. Defendants have failed to implement BAT and BCT at the Facility for its discharges of Total Suspended Solids and pH in violation of Effluent Limitation V.A. of the General Permit.

88. Defendants have also failed to implement BAT and BCT at the Facility for its discharges of Aluminum, Iron, Lead, Zinc, Nitrate plus Nitrite Nitrogen and Phosphorus in violation of Effluent Limitation V.A. of the General Permit.

89. Defendants' ongoing failure to implement BAT and BCT at the Facility is evidenced by, *inter alia*, Defendants' exceedances of EPA benchmarks and failure to perform an adequate potential pollutant source assessment.

90. Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

91. Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

92. Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least July 13, 0212.  Defendants are subject to civil penalties for each and every violation of the Act since July 13, 2012  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Monitoring Implementation Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

93. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

94. Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

95. Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failure to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, its continuing failure to collect and analyze storm water samples from all discharge locations, its continuing failure to analyze all storm water samples for all pollutants required by the applicable SIC Code, its continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants as the General Permit requires, and its continuing failure to use the correct test methods to analyze storm water samples.  For example, Defendants have not analyzed storm water samples for arsenic and copper for those discharges at its facility that are associated with its wood preserving operations, in violation of Monitoring provision XI.B(d) of the permit, and Defendants have not analyzed storm water samples for Aluminum, Iron, Lead, Nitrate plus Nitrite Nitrogen and Phosphorus in violation of Monitoring provision XI.B(d).  Defendants used the test method EPA 200.7 for analyzing samples of storm water for Zinc, test method EPA 1664B for analyzing samples of storm water for oil and grease, and test method HACH 8000 for analyzing samples of storm water for chemical oxygen demand in violation of Section XI.B.7 of the General Permit.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

96. Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since at least July 13, 2012.  These violations are ongoing and continuous.

97.  Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since July 13, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### FOURTH CLAIM FOR RELIEF

**Discharges of Contaminated Storm Water From The Facility
in Violation of the Permit's Water-Quality Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

98. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

99. Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

100. Plaintiff is informed and believes, and thereupon alleges, that since at least July 13, 2012, Defendants have been discharging polluted storm water from the Facility into Humboldt Bay, in violation of the General Permit.

101. During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility directly into Humboldt Bay.

102. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1   violation of Discharge Prohibition III.C of the General Permit.

2         103. Plaintiff is informed and believes, and thereupon allege, that these discharges of

3   contaminated storm water are adversely affecting human health and the environment in violation of

4   Receiving Water Limitations VI.A and VI.B of the General Permit.

5         104. Plaintiff is informed and believes, and thereupon alleges, that these discharges of

6   contaminated storm water are contributing to the violation of the applicable water quality standards in the

7   Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in

8   violation of Receiving Water Limitation VI.A of the General Permit because Defendants' storm water

9   discharges contain high levels of dioxins which contribute to the Humboldt Bay's dioxin impairment.

10        105. Plaintiff is informed and believes, and thereupon alleges, that on every day with significant

11  rainfall since July 13, 2012, Defendants have discharged and continues to discharge polluted storm water

12  from the Facility in violation of the General Permit. These violations are ongoing and continuous.

13        106. Every day Defendants have discharged and continues to discharge polluted storm water from

14  the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the

15  Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the

16  Act since July 13, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

17  **VII.**   **RELIEF REQUESTED**

18        Wherefore, CATs respectfully requests that this Court grant the following relief:

19        a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33

20  U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued

21  pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and

22  procedural requirements of the General Permit and the CWA as alleged herein.

23        b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface

24  waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

25        c.   Enjoin Defendants from further violating the substantive and procedural requirements

26  of the General Permit and the Act;

27        d.   Order Defendants to pay civil penalties of $37,500 per day per violation for all

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1  violations occurring after September 7, 2011, and $51,570 per day per violation for all violations

2  occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§

3  1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

4          e.   Order Defendants to take appropriate actions to restore the quality of navigable waters

5  impaired by their activities;

6          f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

7  consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

8          g.   Award any such other and further relief as this Court may deem appropriate.

9  Dated: September 12, 2017                    Respectfully Submitted,

10                                              LAW OFFICES OF ANDREW L. PACKARD

11                                              By: /s/ William N. Carlon

12                                                  William N. Carlon
                                                    Attorney for Plaintiff
13                                                  CALIFORNIANS FOR
                                                    ALTERNATIVES TO TOXICS
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28