UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIANS FOR ALTERNATIVES
TO TOXICS,

            Plaintiff,

    v.

SCHNEIDER DOCK & INTERMODAL
FACILITY, INC., et al.,

            Defendants.

Case No. 17-cv-05287-JST

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Re: ECF No. 67

Before the Court is Plaintiff Californians for Alternatives to Toxics's ("CAT") motion for partial summary judgment. ECF No. 67. The Court will grant the motion in part and deny it in part.

## I.      BACKGROUND

### A.      Clean Water Act Permitting

This case concerns Defendants' compliance with the permitting requirements of the Clean Water Act ("CWA"). The Court therefore briefly reviews the CWA's permit scheme before describing the relevant facts and history of this litigation.

Congress enacted the CWA in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "Section 301(a) of the CWA prohibits the 'discharge of any pollutant' from any 'point source' into 'navigable waters' unless the discharge complies with certain other sections of the CWA." *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1198 (9th Cir. 2013) (citing 33 U.S.C. § 1311(a)). The National Pollution Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, functions as "[a] linchpin of the CWA's regulatory scheme," authorizing "certain discharges of pollutants only if in

compliance with government-issued permits, and impos[ing] related monitoring and reporting requirements." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000). An NPDES permit may take the form of an individual permit, which "authorizes a specific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process," or a general permit, which "is issued for an entire class of hypothetical dischargers in a given geographical region and is issued pursuant to administrative rulemaking procedures." *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014) (citations omitted).

Recognizing that "[s]tormwater runoff is one of the most significant sources of water pollution in the nation," *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 840 (9th Cir. 2003), Congress amended the CWA in 1987 "to establish a framework for regulating storm water discharges through the NPDES system," *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 915 (9th Cir. 2004) (citing Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)). As relevant here, the 1987 amendments subjected storm water "discharges associated with industrial activity"[1] to NPDES permitting requirements. *See* 33 U.S.C. § 1342(p)(3)(A).

Under the CWA, the Environmental Protection Agency ("EPA") may delegate to qualifying states the authority to oversee and implement their own NPDES programs. *Id.* § 1342(b). California is one such state. *See Nat. Res. Def. Council*, 725 F.3d at 1198; Cal. Water Code § 13160 (designating State Water Resources Control Board as implementing authority for the CWA). The EPA's regulations governing storm water discharges allow California to either "issue individual permits to industrial dischargers" or to "cover many dischargers under the terms of one general permit." *Waterkeepers N. Cal.*, 375 F.3d at 915; *see also* 40 C.F.R. § 122.26.

During the relevant timeframe, industrial storm water dischargers in California have been subject to a single, statewide general permit. *See* State Water Resources Control Board, Water

---

[1] "The Clean Water Act uses the spelling 'stormwater,' although the EPA has chosen to use 'storm water' in its implementing regulations. Throughout this Order, the Court refers to 'storm water' except where the alternate spelling is part of a direct quotation." *Envtl. World Watch, Inc. v. Walt Disney Co.*, No. CV0904045DMGPLAX, 2013 WL 12114822, at *1 (C.D. Cal. Sept. 23, 2013).

2

Quality Order No. 97-03-DWQ: NPDES General Permit No. CAS000001 ("1997 General Permit),

ECF No. 68 at 214-92; State Water Resources Control Board, Water Quality Order No. 2014-

0057-DWQ: NPDES General Permit No. CAS000001 ("2015 General Permit"), ECF No. 68 at 5-

212.[2]  The 1997 General Permit imposes "four basic requirements":

> First, permittees must implement best management practices
> ("BMPs") to reduce or prevent pollutants in storm water discharges.
> Second, the Permit forbids discharges of storm water that cause or
> contribute to an exceedance of applicable Water Quality Standards in
> the applicable water quality or basin plan.  Third, permittees must
> develop and implement a Storm Water Pollution Prevention Plan
> ("SWPPP").  Fourth, permittees must develop and implement a
> Monitoring and Reporting Program ("M & RP") in compliance with
> Section B of the Permit, which includes filing annual reports with the
> Regional Water Quality Control Board.

*S.F. Baykeeper v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208, 1212 (N.D. Cal. 2013).  As

relevant here, the 2015 General Permit contains similar requirements, although the monitoring

requirement terminology has shifted to Monitoring Implementation Plan ("MIP").  2015 General

Permit § X(I).  (Like the parties, the Court uses MIP to describe the 1997 General Permit's

corresponding requirement as well.)  In order to obtain coverage under the General Permit,

industrial discharges must file a Notice of Intent ("NOI") with the Board that includes, among

other things, a SWPPP and MIP.  2015 General Permit § II(B)(1); *see also* 40 C.F.R. § 122.28(b)

(general permit requirements applicable to state NPDES programs).  Although the Regional Water

Boards may reject or require revisions to deficient applications, affirmative state approval is not

required for a permittee to begin operating under the General Permit.  2015 General Permit § XIX.

While the Water Boards have the authority to enforce the General Permit, a private party

may also sue for violations of the General Permit's terms under the CWA's citizen suit provision.

*See Pac. Lumber Co.*, 230 F.3d at 1145 (citing 33 U.S.C. §§ 1365, 1365(f)(6)).[3]  Prior to

---

[2] The Court GRANTS CAT's unopposed request to take judicial notice of the 1997 and 2015
General Permits, ECF No. 68, which are publicly available "records of state agencies."  *Disabled
Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004).

[3] Section 1365(a)(1) permits citizen suits against "any person . . . who is alleged to be in violation
of . . . an effluent standard or limitation under this chapter or . . . an order issued by the [EPA]
Administrator or a State with respect to such a standard or limitation."  Section 1365(f)(6), in turn,
defines an "effluent standard or limitation" to include "a permit or condition thereof issued under

1   commencing suit, the CWA requires citizen plaintiffs to provide at least 60 days notice to the

2   alleged violator.  33 U.S.C. § 1365(b)(1)(A).  The Ninth Circuit has concluded that compliance

3   with this notice requirement "is a jurisdictional necessity."  *Ctr. for Biological Diversity v. Marina*

4   *Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009).

5           **B.      Factual Background[4]**

6           Defendant Schneider Dock Industrial Park, LLC ("SDIP" or "Schneider Park") owns a 16-

7   acre parcel on the Humboldt Bay waterfront in Eureka, California.  ECF No. 78-7 ¶¶ 4-6.  ECF

8   No. 78-23 ¶ 2.  Schneider Park operates an industrial park on the property, leasing buildings to

9   various industrial tenants.  ECF No. 69-1 at 22.  Defendant David Schneider manages Schneider

10  Park, although the LLC's ownership is currently held in a trust with his grandchildren as the sole

11  beneficiaries.  *Id.* at 22-24; *see also* ECF No. 78-23 ¶ 1.  Besides David Schneider, Schneider Park

12  has no employees.  ECF No. 69-1 at 23.

13          Defendant Schneider Dock & Intermodal Facility, Inc. ("SDIF") is a separate entity.  ECF

14  No. 78-23 ¶ 1.  David[5] and his son, Defendant Ryan Schneider, incorporated SDIF in 2011; when

15  David retired in 2016, Ryan became the sole owner and operator of SDIF.  ECF No. 78-7 ¶¶ 2, 6.

16          On January 16, 2001, SDIF filed an NOI to operate under the 1997 General Permit,

17  including a SWPPP ("2001 SWPPP and MIP").  ECF No. 78-25.  At the time, David Schneider's

18  plan was to operate a marine cargo handling facility, as reflected in the 2001 SWPPP's

19  description:  "Cargo and freight delivered to the Intermodal Facility is unloaded and delivered

20  either directly to the Facility for reloading or inventoried and stored until shipping is made. . . .

21  The Intermodal Facility has the capabilities to accept and disseminate containers by rail, truck, or

22  ocean-going vessels."  *Id.* at 4; *see also* ECF No. 78-7 ¶ 6.  There were no active agreements to

23  ship cargo when the 2001 SWPPP was filed, ECF No. 69-1 at 35, and the anticipated shipping

24  _____

25  section 1342 of this title."

26  [4] The Court presents the facts herein "in the light most favorable to the nonmoving party," the
    Defendants.  *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1013 (9th Cir. 2018).

27  [5] To distinguish among the various Schneider defendants, the Court uses the individual
    defendants' first names for clarity.  The Court intends no disrespect.

28

traffic never materialized, ECF No. 78-7 ¶ 6.

Around 2011, David and Ryan Schneider, operating as SDIF, began running a log handling business where they would "receive untreated logs, remove the bark, store the logs, and arrange for transport from the facility, usually by truck or by sea." ECF No. 78-7 ¶ 2. SDIF leases a portion of the Schneider Park property for these operations. *Id.* When the logs are transported by sea, they are transferred to Schneider Park's dock for shipment. *Id.* The removed bark is temporarily stored at the leased SDIF Facility until enough bark has accumulated for it to be cost efficient to pay for offsite transport and recycling. *Id.* ¶ 5. Since 2014, when Schneider Park acquired an additional five acres, ECF No. 69-1 at 29, the SDIF Facility has occupied roughly the same portion of the property.

On April 2, 2014, the Board adopted the 2015 General Permit, to take effect on July 1, 2015. 2015 General Permit at i. On January 26, 2015, SDIF filed an NOI to be covered under the 2015 General Permit, and a minor amendment to the 2001 SWPPP that reflected Ryan's "assumption of the role as the Operator of the SDIF Facility." *Id.* ¶ 6; *see also* ECF No. 78-8. SDIF filed another amended NOI on January 3, 2017, which specified for the first time that the SDIF Facility's operations fell within the category of "Sawmills and Planing Mills, General" and updated the Standard Industrial Classification ("SIC") code accordingly. ECF No. 78-9 at 2.[6]

On May 17, 2017, CAT sent SDIF a 60-day notice of intent to sue under the CWA. ECF No. 55 at 23-36. Apparently in response to the notice's allegations, SDIF filed an amended SWPPP and MIP on September 8, 2017 ("2017 Amended SWPPP and MIP"). ECF No. 78-11.

Four days later, on September 12, 2017, CAT filed this lawsuit, alleging that Defendants had violated, and continued to violate, the CWA. ECF No. 1. CAT amended its complaint on December 21, 2017. ECF No. 33. On February 9, 2018, CAT sent another 60-day notice of intent to sue, this time to Schneider Park. ECF No. 55 at 38-45. CAT filed the operative Second

_____

[6] The scope of industrial activities covered by the industrial storm water discharge regulations is defined by SIC codes. *See Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 512 (9th Cir. 2013) (citing 40 C.F.R. § 122.26(b)(14)). A facility's SIC code also triggers various requirements under the 2015 General Permit, including monitoring for certain parameters in the facility's discharge. *See* 2015 General Permit § XI(11), tbl. 1.

United States District Court
Northern District of California

Amended Complaint ("SAC") on April 11, 2018.  ECF No. 55.

Also in April 2018, SDIF began developing plans to construct various additional storm water control measures on the property, including bioswale detention areas.  ECF No. 78-7.  To accommodate the construction work, SDIF entered into a month-to-month lease with the City of Eureka for a property adjacent to the SDIF Facility.  *Id.* ¶ 15.  The lease began in June 2018, and SDIF vacated the leased property on or about November 10, 2018, after delivering a final load of logs for shipping.  *Id.*  SDIF paid rent on the property through November 30, 2018.  *Id.*

On December 31, 2018, SDIF filed a new SWPPP and MIP reflecting, among other things, the new storm water control measures ("2018 SWPPP and MIP").  ECF No. 78-12.

The SAC alleges that Defendants (1) failed to develop and implement an adequate SWPPP; (2) failed to develop and implement the requisite control technology for the Facility; (3) failed to develop and implement an adequate MIP; and (4) discharged storm water in violation of the General Permit, or without a permit more generally.  CAT seeks injunctive relief and civil penalties for these alleged violations.  SAC at 20-21.  On January 28, 2019, CAT filed this motion for partial summary judgment on its SWPPP and MIP claims.  ECF No. 67.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine only if there is sufficient evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the case.  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  The court must draw all reasonable inferences in the light most favorable to the nonmoving party.  *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of

proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. *Id.* at 1102-03. If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### III.      EVIDENTIARY OBJECTIONS

As a threshold matter, Defendants' opposition objects on admissibility grounds to (1) excerpts from the depositions of David and Ryan Schneider and (2) certain laboratory test results. ECF No. 79 at 14 n.3.

Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925-26 (9th Cir. 2014) ("[E]vidence may be offered to support or dispute a fact on summary judgment only if it could be presented in an admissible form at trial." (internal quotation marks and citation omitted)). The rule places "[t]he burden . . . on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

Defendants argue that the depositions excerpts were not properly authenticated with a reporter's certification. ECF No. 79 at 14 n.3 (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)). Because CAT has now provided the reporter's certification for each deposition transcript, *see* ECF No. 81 at 4, 6, Defendants' objection is OVERRULED.

Defendants also argue that the laboratory test results are inadmissible hearsay. ECF No. 79 at 14 n.3. CAT's subsequent inclusion of a declaration from the laboratory supervisor, ECF No. 82, suffices to demonstrate that CAT could properly authenticate these records at trial. *See*

Fed. R. Evid. 803(6). The Court likewise OVERRULES this objection.[7]

## IV.    DISCUSSION

Before turning the merits of CAT's claims, the Court first addresses two issues raised by Defendants: (1) CAT's standing and (2) the scope of the Court's jurisdiction over the asserted claims.

### A.    Article III Standing

#### 1.    Legal Standard

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

An organization has standing where "at least one of its 'members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917-18 (9th Cir. 2018) (quoting *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013)).

---

[7] To the extent that Defendants' opposition indicates their belief that the laboratory's "testing does not meet *Daubert* standards," *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007), the appropriate course is to bring a motion supported by argument, rather than an unexplained citation. *See* ECF No. 79 at 14 n.3.

### 2. Discussion

Defendants contend that the Court should deny summary judgment because CAT has not adequately demonstrated injury-in-fact or causation. The Court disagrees.

CAT member Larry Glass avers that he kayaks on Humboldt Bay "a couple times a week," and used to do so "immediately adjacent to where the Schneider Dock and Intermodal Facility ('SDIF') is located." ECF No. 74 ¶¶ 3-4. Because of pollution in that part of the Bay, he has avoided kayaking there in recent years. *Id.* ¶¶ 4, 6-7. Glass perceives storm water runoff from the SDIF Facility to be "a major contributor" to that pollution, *id.* ¶ 4, noting that he encountered two large, foul-smelling plumes while kayaking past the facility after a large storm, *id.* ¶ 6.

CAT member James Cotton is a retired marine biologist who lives near Humboldt Bay. ECF No. 73 ¶¶ 1-2. He declares that pollution of Humboldt Bay, to which the Facility's runoff contributes, causes him aesthetic and recreational injury by impairing the ecosystem and harming various species that he takes pleasure in observing. *Id.* ¶¶ 3-5. Further, Cotton has been catching and eating fish and shellfish from Humboldt Bay for decades, but he has shifted those activities to the more distant Trinidad Bay due to similar pollution concerns. *Id.* ¶ 6.

Defendants first argue that CAT's standing declarants have not sufficiently alleged that they use an area near the Facility. ECF No. 79 at 17. This argument is factually and legally flawed. Factually, Glass states that he frequently kayaked immediately adjacent to the Facility. ECF No. 74 ¶ 3. Legally, this argument asks the wrong question. As the Ninth Circuit recently explained, such "[a] proximity concern arises only where 'a plaintiff claiming injury from environmental damage [fails to demonstrate] use [of] the area *affected by the challenged activity*,' and instead only shows that she uses 'an area roughly "in the vicinity" of it.'" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017) (emphasis and alterations in original) (quoting *Lujan*, 504 U.S. at 565-66). Therefore, "[w]hether [CAT's] members use an area near the *source* of environmental damage elsewhere is of no moment." *Id.* The question is whether the challenged conduct affects CAT's members' enjoyment of the areas that they do use.

Lurking beneath Defendants' standing argument is a suggestion that any unlawful discharges are insignificant within the Humboldt Bay watershed and therefore do not

meaningfully contribute to CAT's members' injuries. But it is no answer to "challenge as implausible the notion that polluted stormwater from the [SDIF] facility could possibly have an environmental impact on a body of water as large as [Humboldt] Bay." *Id.* Rather, "[w]hether that inflow of pollutants from [the SDIF] facility is actually significant enough to harm the affected area is a merits question, not a standing question." *Id.* at 1094. In other words, "the threshold question of citizen standing under the CWA is whether an individual can show that *she* has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm." *Pac. Lumber Co.*, 230 F.3d at 1151.

Accordingly, it is sufficient that CAT's members "have derived recreational and aesthetic benefit from their use of the Bay (including areas of the Bay next to [the SDIF Facility]), but that their use has been curtailed because of their concerns about pollution, contaminated fish, and the like." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 994 (9th Cir. 2000). CAT's declarations fit comfortably within Ninth Circuit precedent on this question. *See Pac. Gas & Elec. Co.*, 874 F.3d at 1094 ("By attesting to their reduced ability to enjoy eating local seafood in Bay Area restaurants, observing birds and other wildlife from the air or from the wetlands around Oakland Airport, or sailing and swimming safely in San Francisco Bay, among other harms, EcoRights members have alleged concrete and particularized injuries from the alleged migration of PCP and dioxins from PG&E's Hayward facility to the affected area, San Francisco Bay."); *Nat. Res. Def. Council v. U.S. E.P.A.*, 542 F.3d 1235, 1245 (9th Cir. 2008) ("[M]embers' statements that their use of specific waterways has been diminished due to their concerns about discharge from a particular source (here, the construction sites) are sufficient to establish injury in fact.").

Second, Defendants contend that causation is lacking because CAT has not "offer[ed] evidence that the alleged injuries are related in any way to allegedly deficient site maps or inadequate monitoring plans." ECF No. 79 at 18. Again, this misstates the relevant inquiry. As an initial matter, "the threshold requirement of 'traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the

plaintiffs' in order to establish standing." *Sw. Marine*, 236 F.3d at 995 (alteration in original) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (en banc)). In the CWA context, causation does not require "pinpointing the origins of particular molecules"; instead, "a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.* (quoting *Gaston Copper Recycling*, 204 F.3d at 161).

Further, the CWA "not only regulates actual water pollution, but embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution." *Pac. Lumber Co.*, 230 F.3d at 1152 n.12. Therefore, "[i]t is not necessary for a plaintiff challenging violations of rules designed to reduce the *risk* of pollution to show the presence of actual pollution in order to obtain standing." *Id.* The Ninth Circuit has observed that, in the CWA, "Congress has expressed its view that developing [certain regulations] reduces the risk of the pollution causing the members' injury" and that "that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects." *Nat. Res. Def. Council v. U.S. E.P.A.*, 542 F.3d at 1248; *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." (quoting *Lujan*, 504 U.S., at 580 (Kennedy, J., concurring in part and concurring in judgment)). A court can similarly infer a causal connection from *violations* of the regulatory requirements embodied in the General Permit. *Cf.* 33 U.S.C. § 1342(p)(6) (requiring EPA to issue NPDES storm water permitting regulations); 40 C.F.R. § 122.26 (establishing various reporting and monitoring requirements for storm water discharge permits).

Indeed, the Ninth Circuit in *Pacific Lumber* addressed this same issue in the context of a similar suite of alleged violations of California's General Permit. *See* 230 F.3d at 1147 (allegations of "unpermitted discharges of contaminated storm water; failure to prepare and implement an adequate SWPPP; failure to comply with the General Permit's reporting and monitoring conditions; and failures to conduct required visual observations and to collect storm water samples" (footnote omitted)). Noting that the CWA "allows citizen suits based on

violations of any conditions of an NPDES permit, even those which are purely procedural," the Ninth Circuit explained that "to require actual evidence of environmental harm, rather than an increased risk based on a violation of the statute, misunderstands the nature of environmental harm, and would undermine enforcement of the Clean Water Act." *Id.* at 1151. Accordingly, the court found it sufficient for Article III purposes that the organization's members' enjoyment of their activities was "lessened due to [defendant's] alleged violations of various provisions of the Clean Water Act designed precisely to prevent the irreparable environmental degradation of the nation's waters before it occurs." *Id.* at 1152.[8]

Finally, Defendants do not dispute that this litigation concerns interests germane to CAT's purpose, or that the participation of individual CAT members is not required. *See Friends of Santa Clara River*, 887 F.3d at 917-18. The Court agrees that these elements are satisfied.

The Court therefore concludes that CAT has standing for its CWA claims.

### B.      Subject-Matter Jurisdiction Over Pre-Complaint Violations

As a general matter, the Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a)(1). Defendants argue, however, that the Court lacks jurisdiction over alleged violations that occurred prior to September 8, 2017, citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). ECF No. 79 at 18-19.

#### 1.      Legal Standard

33 U.S.C. § 1365(a)(1) confers jurisdiction over citizen suits "against any person . . . who is alleged to be in violation of" the CWA's requirements. In *Gwaltney*, the Supreme Court interpreted this language to preclude "citizen suits for wholly past violations." 484 U.S. at 64. But the Court agreed that this provision "confer[red] jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." *Id.*

The Ninth Circuit has explained how to apply *Gwaltney* over the life of a CWA citizen suit. First, in order for "*Gwaltney*'s threshold requirement for jurisdiction" to be satisfied, the

---

[8] Given the abundance of Ninth Circuit precedent on these precise issues, the Court finds unpersuasive Defendants' exclusive reliance on out-of-circuit cases, one of which is unpublished and non-citable. *See* ECF No. 79 at 16-18.

United States District Court
Northern District of California

court must find that the citizen-plaintiff has made "a good-faith allegation of continuous or intermittent violation." *Sw. Marine*, 236 F.3d at 998 (second quoting *Gwaltney*, 484 U.S. at 64). Second, "[t]o prevail at trial, a citizen-plaintiff must prove that ongoing violations actually have occurred." *Id.* At this stage, "a citizen plaintiff may prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Id.* (quoting *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988)). Moreover, "[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* (quoting *Sierra Club*, 853 F.2d at 671).

Accordingly, a court cannot impose penalties on a CWA defendant at summary judgment for past violations, unless the plaintiff also carries its burden to show ongoing violations. But the Ninth Circuit has suggested that where a court finds that a defendant committed past violations, liability may be "conditioned on [the plaintiff's] ability to prove ongoing violations" in further proceedings. *Sierra Club*, 853 F.2d at 671 (leaving in place finding of liability for past violations and remanding for further proceedings on ongoing violations).

### 2. Discussion

Defendants stress that SDIF filed the 2017 Amended SWPPP and MIP on September 8, 2017, *see* ECF No. 78-11 at 2, and that CAT did not initiate this action until four days later, on September 12, 2017, *see* ECF No. 1. Defendants therefore argue that any defects that were cured by those amendments are wholly past violations that predate the complaint. ECF No. 79 at 18-19.

Defendants do not contend that CAT failed to make a good-faith allegation of ongoing violations. Because the Court also does not perceive any bad-faith allegations, it concludes that CAT has "satisfied *Gwaltney*'s threshold requirement for jurisdiction." *Sw. Marine*, 236 F.3d at 998; *see also Sierra Club*, 853 F.2d at 669 ("If the defendant wishes to argue that the allegations are untrue, and that the citizen plaintiff lacks standing to bring the suit, the defendant must move for summary judgment and demonstrate that 'the allegations were sham and raised no genuine issue of fact.'" (quoting *Gwaltney*, 484 U.S. at 66)).

1    Although Defendants do not identify the specific violations that they deem wholly past, the

2    Court discerns three relevant sets of asserted pre- and post-September 8, 2017 violations: (1) the

3    SWPPP violations; (2) Defendants' failure to sample from all drainage areas (the "MIP Scope"

4    claim); and (3) Defendants' failure to sample for certain pollutants (the "MIP Pollutant" claim).

5    The Court first discusses the merits of these claims, then returns to the question whether CAT has

6    demonstrated ongoing violations.

7    **C.    CWA Violations**

8    In its motion, CAT seeks summary judgment on its claims that SDIF's SWPPP and MIP

9    violated the General Permit throughout the relevant period.

10   **1.    Legal Standard**

11   As a general rule, compliance with an NPDES permit equates to compliance with the

12   CWA. *Nat. Res. Def. Council*, 725 F.3d at 1204 (citing 33 U.S.C. § 1342(k)). Conversely, "a

13   permittee violates the CWA when it discharges pollutants in excess of the levels specified in the

14   permit, or where the permittee otherwise violates the permit's terms." *Id.* Because "[t]he plain

15   language of [33 U.S.C. § 1365] authorizes citizens to enforce *all* permit conditions," any violation

16   of an NPDES permit can be remedied via citizen suit. *Nw. Envtl. Advocates v. City of Portland*,

17   56 F.3d 979, 986 (9th Cir. 1995); *see also* 40 C.F.R. § 122.41(a) ("Any permit noncompliance

18   constitutes a violation of the Clean Water Act and is grounds for enforcement action . . . .").

19   Where the permittee's compliance turns on the meaning of a general permit, the Ninth

20   Circuit has explained that "[w]e interpret general permits as we would a regulation." *Alaska*

21   *Cmty. Action on Toxics*, 765 F.3d at 1172. Therefore, the general permit "should be construed to

22   give effect to the natural and plain meaning of its words." *Id.* (quoting *Bayview Hunters Point*

23   *Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004)).

24   **2.    SWPPP**

25   **a.    2001 SWPPP**

26   CAT first argues that the 2001 SWPPP violated the 1997 General Permit because it did not

27   disclose SDIF's log handling business, and therefore did not include "a narrative description of the

28   facility's industrial facilities," including describing "each industrial process" and "each handling

14

and storage area." 1997 General Permit § A(6)(a)(i)-(ii).[9] Relatedly, CAT contends that the failure to include similar information on the 2001 SWPPP's Site Map violated the 1997 General Permit's requirements to identify "[l]ocations where materials are directly exposed to precipitation" and "[a]reas of industrial activity." *Id.* § A(4)(d)-(e).

There is no genuine dispute that the 2001 SWPPP failed to describe any aspect of the log handling business that SDIF began in 2011 or 2012. Defendants point to various other requirements that were met, such as identifying the Facility's pollution prevention team, ECF No. 79 at 26, but these points are irrelevant because CAT has not alleged violations of those provisions. Defendants' contention that the 2001 Site Map identifies all areas where materials are exposed to precipitation and areas of industrial activity, ECF No. 79 at 27, is belied simply by comparing it to the 2017 Amended Site Map, which denotes a log debarker, as well as log storage areas and bark storage areas, *see* ECF No. 78-11 at 18. None of these elements is present on the original 2001 Site Map. *See* ECF No. 78-25 at 26-27. Indeed, it would be surprising if the 2001 Site Map were to depict aspects of SDIF's log handling business, when the idea to start that business did not arise until a decade later. The 2001 SWPPP's narrative description is similarly deficient. *See id.* at 8-9.

Because no reasonable jury could find that Defendants complied with these provisions of the 1997 General Permit, the Court treats these violations as established in the case. *See* Fed. R. Civ. P. 56(g).

The 2015 General Permit became effective on July 1, 2015. *See* 2015 General Permit at 1. The parties identify no relevant material changes between the 1997 General Permit's and the 2015 General Permit's SWPPP requirements regarding site maps. *Compare* 2015 General Permit § X(E)(3)(e)-(f), *with* 1997 General Permit § A(4)(d)-(e). The 2015 General Permit also contains

---

[9] The 1997 General Permit instructs dischargers to "[d]escribe each industrial process, the type, characteristics, and quantity of significant materials used in or resulting from the process, and a description of the manufacturing, cleaning, rinsing, recycling, disposal, or other activities related to the process." *Id.* § A(6)(a)(i). It further requires dischargers to "[d]escribe each handling and storage area, type, characteristics, and quantity of significant materials handled or stored, description of the shipping, receiving, and loading procedures, and the spill or leak prevention and response procedures." *Id.* § A(6)(a)(ii).

similar requirements to identify "each industrial process" and "each material handling and storage area." *Compare* 2015 General Permit § X(G)(1)(a)-(b), *with* 1997 General Permit § A(6)(a)(i)-(ii); *see also* ECF No. 79 at 15 ("The relevant portions of the 2015 General Permit reflect the same standards as the 1997 General Permit except where specifically noted.").

SDIF's 2015 amendment to the SWPPP did not amend the Site Map or add information regarding the use of the Facility for log handling. *See* ECF No. 78-8 at 2-4. Accordingly, there is no genuine dispute that the SWPPP violated the 2015 General Permit during this period as well.

The Court therefore determines that SDIF's SWPPP was inadequate from September 12, 2012, through September 7, 2017.

### b. 2017 Amended SWPPP

On September 8, 2017, SDIF filed an amended SWPPP, which remained in effect until December 31, 2018. *See* ECF No. 78-11. CAT argues that, while the 2017 Amended SWPPP addressed SDIF's log handling business, it still failed to comply with various 2015 General Permit requirements.

First, CAT contends that the 2017 Amended SWPPP failed to disclose and discuss the dock as an area of industrial activity. ECF No. 67 at 17. Although not expressly stated in Defendants' opposition, it appears that their response is that SDIF was not required to mention the dock as an area of industrial activity because (1) Schneider Park, rather than SDIF, owns the dock; and (2) after SDIF transfers processed logs to the dock, third-party "longshoremen take exclusive control of the dock and cargo, in order to load it onto the ship." ECF No. 79 at 12.

The Court finds Defendants' ownership argument unpersuasive. The applicable regulations put the onus on a facility *operator*, not *owner*, to obtain a permit. *See* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). Given that there is no dispute that SDIF operates the log handling business and is the permittee, the logical conclusion is that the SWPPP's scope should extend to areas over which SDIF exercises operational control. This reading is confirmed by the 2015 General Permit, which defines "Facility" as "[a] collection of industrial processes discharging storm water associated with industrial activity *within the property boundary or*

*operational unit*." 2015 General Permit, Attachment C, at 3. Although "operational unit" is not separately defined, the 2015 General Permit's definition of "Operator" likewise focuses on practical questions of control. Accordingly, an operator is "any party associated with an industrial facility" that either (1) "has operational control over the industrial SWPPP and SWPPP specifications, including the ability to make modifications to those plans and specifications" or (2) "has day-to-day operational control of activities at the facility which are necessary to ensure compliance with a SWPPP for the facility or other permit conditions (e.g. authorized to direct workers at a site to carry out activities directed by the SWPPP or comply with other permit conditions)." 2015 General Permit, Attachment C, at 5.

The 2015 General Permit's accompanying Fact Sheet lends further support to this conclusion. The Fact Sheet discusses "auxiliary functions," such as "storage facilities for the establishment's own materials." 2015 General Permit, Fact Sheet at 9. It explains that when "auxiliary functions are performed at the same physical location as the establishment, then they are subject to General Permit coverage if they are associated with industrial activities." *Id.* at 10. Here, the dock and SDIF's leased property are not "physically separate facilities," *id.* at 9, but rather immediately adjacent areas that have no separating barrier. *See* ECF No. 69-1 at 6.

Although the Court rejects Defendants' ownership argument, the parties raise factual issues regarding the degree of SDIF's use and control of the dock that are not amenable to resolution at summary judgment. CAT emphasizes, for instance, that SDIF sometimes pays Schneider Park a wharfage fee for the use of the dock for transferring logs, ECF No. 69-1 at 77-78, and that the use of the dock for transferring logs is a critical component of SDIF's business, ECF No. 67 at 17. Defendants contend that the longshoremen exercise "exclusive control of the dock," ECF No. 79 at 12, albeit without citation to the record. Nonetheless, viewing CAT's evidence of operational control in the light most favorable to Defendants, it does not conclusively establish that the dock is a part of the Facility that needed to be identified on the SWPPP.

Second, CAT argues that SDIF failed to update the 2017 Amended SWPPP to account for storing logs on the City of Eureka lot between June 2018 and November 2018. ECF No. 67 at 18. Defendants counter that an update was unnecessary because this was "not a significant change in

17

1   the SDI Facility within the meaning of the General Permit."  ECF No. 79 at 20.  CAT offers no

2   further argument on reply.

3       The 2015 General Permit requires permittees to "[r]evise their on-site SWPPP whenever

4   necessary."  2015 General Permit § X(B)(1).  Further, permittees must "certify and submit . . .

5   their SWPPP within 30 days whenever the SWPPP contains significant revisions."  *Id.* § X(B)(2).

6   If the revisions are not significant, the permittee "is not required to certify and submit [the

7   revisions] more than once every three (3) months in the reporting year."  *Id.* § X(B)(3).  Reading

8   these provisions together, it is "necessary" to revise a SWPPP for both "significant" and non-

9   significant changes to the permittee's operations.

10      The parties do not provide any further argument on when revisions are necessary, nor do

11  they attempt to articulate a standard for when an operational change and accompanying SWPPP

12  revision are "significant."  Given this gap, CAT has failed to carry its burden to demonstrate its

13  entitlement to summary judgment, particularly when viewing the evidence in Defendants' favor.

14      Third, CAT contends that SDIF "stockpile[ed] concrete rubble and debris on the site"

15  between September 7, 2017, and December 31, 2018, without updating the SWPPP to reflect this

16  activity.  ECF No. 67 at 18; *see also, e.g.*, ECF No. 70-1 at 19.  CAT argues that the SWPPP's

17  "list of industrial materials handled at the facility, and the locations where each material is stored,

18  received, shipped, and handled," was therefore incomplete.  2015 General Permit § X(F).

19      Defendants represent that they acquired this material to fill sinkholes that periodically

20  develop on-site but, for various reasons, will not use it until after the 2019 storm season.  ECF No.

21  79 at 11, 23.  Defendants argue that the SWPPP did not need to mention this concrete storage

22  because (1) it was not related to the industrial activities for which they sought coverage under the

23  General Permit and (2) based on the topography of the storage area, storm water is more likely to

24  run onto the area, rather than off.  ECF No. 79 at 23.  Once again, CAT does not address these

25  contentions in its reply.

26      The Court finds problems similar to those in CAT's previous argument.  Neither party has

27  offered any reasoned argument whether Section X(F), which by its terms covers "industrial

28  materials handled at the facility," is limited to materials described in Section X(G)(1)(a), which

18

1    discusses "industrial materials used in or resulting from [an industrial] process." Moreover, there

2    are disputed factual issues as to the exact setting in which the concrete is stored. Accordingly, the

3    Court finds that CAT has not carried its burden on this point.

4        Finally, CAT asserts that SDIF "began to make fundamental changes to the drainage

5    topography of the Schneider Dock facility" in March 2018 but did not revise the SWPPP to reflect

6    those changes. ECF No. 67 at 18. As a result, CAT reasons, the 2017 Amended Site Map did not

7    contain accurate "[l]ocations of storm water collection and conveyance systems" and "[l]ocations

8    and descriptions of structural control measures that affect industrial storm water discharges."

9    2015 General Permit § X(E)(3)(b)-(c).

10       Although Defendants do not directly address these alleged changes, they state that SDIF

11   constructed advanced BMPs between September 2018 and mid-December 2018. ECF No. 79 at

12   12. Defendants assert that their certification of a new SWPPP on December 31, 2018, was

13   therefore timely. *Id.* at 23-24.

14       CAT relies on a series of photographs and videos of the Facility taken at various points

15   between 2017 and the end of 2018. *See, e.g.*, ECF No. 70-1 at 4 (May 16, 2017); *id.* at 2 (January

16   24, 2018); *id.* at 6, 8 (April 9, 2018); ECF No. 70-2 at 6, 8 (November 9, 2018). Defendants make

17   no attempt to address this evidence or otherwise contextualize these photographs, which conflict

18   with Defendants' purported timeline. Nonetheless, the question whether these photographs

19   establish changes in the Facility's storm water conveyances and structural control measures

20   requires deciding factual issues that the Court cannot resolve in CAT's favor at this stage.

21       Accordingly, the Court concludes that CAT is not entitled to summary judgment that the

22   2017 Amended SWPPP violated the 2015 General Permit, largely due to disputed factual issues

23   underlying the asserted violations.

24                  **c.    2018 SWPPP**

25       CAT contends that the 2018 SWPPP is inadequate because the Site Map does not identify

26   one of the "municipal storm drain inlets that may receive the facility's industrial storm water

27   discharges," 2015 General Permit § X(E)(3)(a), and relatedly, omits one of the "pathways by

28   which pollutants may be exposed to storm water," *id.* § X(G)(2)(a)(v). Specifically, CAT asserts

1 that storm water flows from the City of Eureka's adjacent lot, contacts an SDIF berm constructed

2 from bark waste and other industrial material, and then runs off into a municipal storm drain inlet.

3 ECF No. 67 at 21; ECF No. 80 at 12. Defendants respond that the storm water "is not coming

4 from SDIF and therefore neither that storm drain inlet or the 'discharge point' should be depicted

5 on the Facility's SWPPP and site map." ECF No. 79 at 25.

6 Whether the 2018 SWPPP complies with Section X(E)(3)(a) therefore turns on whether

7 "the facility's industrial storm water discharges" include storm water that originates from outside

8 of the facility and then "runs on"[10] to the facility and contacts industrial materials, thereby

9 accumulating pollutants that are ultimately discharged. Similarly, the Court must determine

10 whether the berm constitutes a "potential industrial pollutant source[]" for which SDIF had to

11 evaluate exposure pathways. 2015 General Permit § X(G)(2)(a).

12 As an initial matter, the Court notes that Defendants identify no affirmative support for

13 their interpretation in the record, the General Permit, or the underlying regulatory framework. An

14 examination of the General Permit, moreover, supports CAT's competing position.

15 Defendants do not appear to dispute that the berm is comprised partly of bark waste from

16 their log processing operations. *See* ECF No. 67 at 21; ECF No. 69-1 at 94-95. That bark waste

17 falls within "industrial material handled, produced, stored, *recycled, or disposed*." 2015 General

18 Permit § X(G)(2)(a)(iii) (emphasis added). Accordingly, the 2018 SWPPP's potential pollutant

19 source assessment should have included "[t]he degree to which the pollutants associated with

20 those materials may be exposed to, and mobilized by contact with, storm water." *Id.*

21 § X(G)(2)(a)(iv). It likewise should have discussed "[t]he direct and indirect pathways by which

22 pollutants may be exposed to storm water." *Id.* § X(G)(2)(a)(v). Similarly, because the alleged

23 storm water discharge derives its pollutants from the industrial materials produced by SDIF's

24 permitted activities, the Court concludes that it falls within the Facility's "industrial storm water

25 discharges." *Id.* § X(E)(3)(a).

26

27 [10] Under the 2015 General Permit, run-on consists of "[d]ischarges that originate offsite and flow
onto the property of a separate facility or property or, discharges that originate onsite from areas
28 not related to industrial activities and flow onto areas on the property with industrial activity."
2015 General Permit, Attachment C at 6.

Moreover, the 2015 General Permit's BMPs demonstrate that whether the pollutants are mobilized by storm water that originates elsewhere does not alter a discharger's obligation to account for these pathways in the SWPPP. The permit requires a discharger to, "to the extent feasible, implement and maintain . . . minimum BMPs to reduce or prevent pollutants *in industrial storm water discharges*." *Id.* § X(H)(1) (emphasis added). The minimum BMPs require the discharger to "[d]ivert run-on and storm water generated from within the facility away from all stockpiled materials," *id.* § X(H)(1)(d)(iv), and "[d]ivert run-on and storm water generated from within the facility away from all erodible materials," *id.* § X(H)(e)(iv). By mandating that all dischargers take steps to prevent run-on from contacting stockpiled or erodible materials, the permit necessarily recognizes that these steps "reduce or prevent pollutants in industrial storm water discharges." *Id.* § X(H)(1). Stated differently, run-on contacting industrial materials on-site may lead to an industrial storm water discharge within the meaning of the General Permit.[11]

While the Court agrees with CAT's interpretation of the 2015 General Permit, the evidence presented is ambiguous as to whether run-on interacts with the berm pile in the manner alleged. Accordingly, the Court concludes that fact issues preclude summary judgment on whether the 2018 SWPPP violated the 2015 General Permit.

In sum, the Court holds that the 2001 SWPPP violated the General Permit but denies summary judgment on the questions whether the 2017 Amended SWPPP or 2018 SWPPP did so as well.

### 3. MIP

#### a. MIP Scope Claim

First, CAT contends that SDIF has failed to comply with the 2015 General Permit's requirement that storm water samples "be collected from each drainage area at all discharge locations." 2015 General Permit § XI(B)(4). The 1997 General Permit similarly requires that

---

[11] This reading of the General Permit is likewise consistent with the EPA's regulatory definition of "[s]torm water discharge associated with industrial activity," which "means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).

1    "[a]ll storm water discharge locations shall be sampled." 1997 General Permit § B(5)(a).

2         Defendants do not dispute that SDIF has never collected storm water samples from

3    Drainage Areas 3 and 4. *Compare* ECF No. 67 at 23, *with* ECF No. 79 at 21-22. But Defendants

4    point to the 2015 General Permit's provisions for "Representative Sampling Reduction," under

5    which the permittee "may reduce the number of locations to be sampled in each drainage area

6    (e.g., roofs with multiple downspouts, loading/unloading areas with multiple storm drains) if the

7    industrial activities, BMPs, and physical characteristics (grade, surface materials, etc.) of the

8    drainage area for each location to be sampled are substantially similar to one another." 2015

9    General Permit § XI(C)(4)(a). Defendants note that SDIF submitted a representative sampling

10   justification with the 2017 Amended MIP. *See* ECF No. 78-11 at 13-14. Further, Defendants

11   stress that "[t]he Regional Water Board may reject the Representative Sampling Reduction

12   justification and/or request additional supporting documentation," 2015 General Permit

13   § XI(C)(4)(d), but that the Board did not do so in this instance. ECF No. 79 at 21.

14        CAT counters that SDIF's representative sampling justification was improper because that

15   provision of the 2015 General Permit allows the discharger to "reduce the number of locations to

16   be sampled in each drainage area," but still requires a sample from each drainage area. 2015

17   General Permit § XI(C)(4)(a). Because SDIF identified four separate drainage areas, CAT argues,

18   SDIF was required to sample from each. ECF No. 80 at 13-14. Moreover, CAT disputes as a

19   factual matter the 2017 Amended MIP's assertion that the sampled and non-sampled drainage

20   areas have "substantially similar" relevant characteristics, 2015 General Permit § XI(C)(4)(a),

21   noting that Drainage Area 3 houses the log debarker that Defendants identify as the greatest source

22   of potential pollution. ECF No. 80 at 14.

23        As an initial matter, Defendants effectively concede that SDIF did not comply with the

24   1997 General Permit's requirement to sample "[a]ll storm water discharge locations." 1997

25   General Permit § B(5)(a). Defendants likewise admit that SDIF did not comply with this aspect of

26   the 2015 General Permit until at least September 8, 2017, when SDIF filed the 2017 Amended

27   MIP.

28        As to the representative sampling justification in the 2017 Amended MIP, the Board's

failure to object does not preclude CAT from arguing that this element of the MIP is inconsistent

with the General Permit's requirements. NOIs "embody each discharger's agreement to abide by

the terms of the general permit." *Envtl. Def. Ctr.*, 344 F.3d at 853. "Because the NOI represents

no more than a formal acceptance of terms elaborated elsewhere, [the traditional general permit]

approach does not require that permitting authorities review an NOI before the party who

submitted the NOI is allowed to discharge" – unlike with individual permit applications. *Id.* The

2015 General Permit similarly does not require the Board to affirmatively approve the terms of an

NOI or accompanying SWPPP or MIP. *See* 2015 General Permit § II. Rather, the Regional Water

Boards "may administratively reject General Permit coverage," including "rescinding General

Permit coverage," or requiring "a Discharger to revise and re-submit" the SWPPP and other

supporting documents. *Id.* § XIX(A). Notwithstanding the Board's failure to exercise that

authority, courts have routinely entertained citizen suits alleging that a SWPPP or MIP did not

comply with the General Permit. *See, e.g*, *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*,

728 F.3d 868, 870-72 (9th Cir. 2013) (holding that state's enforcement action based on different

environmental law did not bar citizen suit based on inadequate SWPPP and monitoring); *Coastal

Envtl. Rights Found. v. Am. Recycling Int'l, Inc.*, No. 17-CV-00425-BAS-JMA, 2017 WL

6270395, at *15 (S.D. Cal. Dec. 8, 2017) (failure to include pollutant in pollutant source

assessment and MIP); *Cal. Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F.

Supp. 3d 1128, 1151-55 (E.D. Cal. 2016) (inadequate SWPPP and MIP); *cf. Pac. Lumber Co.*, 230

F.3d at 1146, 1152-54 (holding plaintiffs had standing to pursue monitoring and SWPPP claims).

     The 2015 General Permit's statement that the Board may specifically object to a

representative sampling reduction justification does not distinguish that element of an MIP from

any other aspects of the NOI and supporting documentation that the Board may reject or require to

be revised. Therefore, it does not remove that provision from potential citizen suit enforcement.

As with any other NPDES permit violation, the permitting authority's "non-enforcement does not

equate to [the permittee's] compliance." *Friends of Outlet Creek v. Grist Creek Aggregates, LLC*,

No. 16-CV-00431-JSW, 2018 WL 2573139, at *9 (N.D. Cal. Apr. 23, 2018); *see also S.F.

Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007) ("The purpose of the citizen suit

provision of the CWA, 33 U.S.C. § 1365, is to permit citizens to enforce the Clean Water Act when the responsible agencies fail or refuse to do so."); *River City Waste Recyclers*, 205 F. Supp. 3d at 1148.

Here, the 2017 Amended MIP facially violates the 2015 General Permit's requirement to sample from each drainage area, even if the representative sampling justification is properly invoked. 2015 General Permit § XI(C)(4)(a). And Defendants do not argue that Drainage Areas 3 and 4 were not, in fact, separate drainage areas.[12] The Court therefore need not reach CAT's alternative arguments that the drainage areas were not substantially similar.

Accordingly, the Court holds that SDIF's MIP was deficient from September 8, 2012 until the present because SDIF did not sample the required drainage areas.

**b.  MIP Pollutant Claim**

CAT also argues that SDIF violated the 2015 General Permit by failing to monitor its storm water discharges for aluminum, copper, and iron. ECF No. 67 at 23. In addition to total suspended solids ("TSS"), pH, and oil and grease, the 2015 General Permit requires permittees to monitor for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants in the pollutant source assessment (Section X.G.2)." 2015 General Permit § XI(B)(6)(c). The pollutant source assessment, in turn, includes "[t]he pollutants likely to be present in industrial storm water discharges." *Id.* § X(G)(2)(a)(ii). The 1997 General Permit contains a similar requirement to analyze samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 General Permit § B(5)(c)(ii).

CAT collected storm water sample discharge samples from Discharge Point 4 on (1) January 24, 2018; (2) February 26, 2018; and (3) March 23, 2018. ECF No. 70 ¶¶ 27-29. CAT then submitted those samples for third-party laboratory testing. *See* ECF No. 70-3 at 15-22, 24-32, 34-40. Based on those tests, which revealed concentrations well above the Numeric Action

---

[12] The 2015 General Permit defines "Drainage Area" as "[t]he area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location." 2015 General Permit, Attachment C at 2. Nothing in the record indicates that Defendants inaccurately characterized these areas in their submissions.

Level[13] for aluminum, copper, and iron, CAT's expert opined that those pollutants were "likely to

be present." ECF No. 71-2 at 50. He further opined that "[l]og yards are known to discharge

storm water with high concentrations of metals, such as aluminum, . . . copper, [and] iron," both

from mineral uptake by the trees that are processed and from disturbing the mineral content of the

unpaved surfaces on site. *Id.* at 49.

Defendants' opposition does not dispute the concentrations of the metals revealed by

CAT's testing. *Cf.* ECF No. 79 at 22-23. Nor do Defendants present samples that did not contain

these metals. Instead, Defendants first argue, without citation, that "the studies suggesting that

debarked trees stored on a log deck leach metals are not well established and therefore

insufficiently studied to yield that conclusion." *Id.* at 22. This is not adequate to rebut CAT's

expert report or create a genuine dispute of fact.

Second, Defendants assert that California "has not seen fit to include other metals as part

of the sampling obligations for the applicable SIC Codes for the SDI Facility." *Id.* In the 2015

General Permit, *subsection (d)* of Section XI(B)(6) requires sampling for "additional applicable

parameters listed in Table 1," which are "dependent on the facility Standard Industrial

Classification (SIC) codes."[14] Since January 3, 2017, Defendants have classified the SDIF

Facility for Sawmills and Planing Mills (2421), ECF No. 78-9 at 2, and Table 1 lists only chemical

oxygen demand and zinc as additional parameters for that SIC code. 2015 General Permit

§ XI(B)(10), tbl. 1. However, *subsection (c)* of the same provision additionally requires

monitoring of "additional parameters identified . . . on a facility-specific basis." *Id.* § XI(B)(6)(c).

United States District Court
Northern District of California

---

[13] Numeric Action Levels ("NALs") are "[p]ollutant concentration levels used to evaluate if best management practices are effective and if additional measures are necessary to control pollutants." 2015 General Permit, Attachment C at 5. However, "NALs are not effluent limits" and "[t]he exceedance of an NAL is not a permit violation." *Id.*

[14] Although Defendants have failed to provide a supporting citation, the Court presumes that they are referring to this portion of the 2015 General Permit. This omission is emblematic of a frustrating lack of citations in major sections of argument within Defendants' opposition. *See, e.g.*, ECF No. 79 at 20-23. "'[A] district court has no independent duty to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" *Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).

To the extent Defendants contend that a discharger has no obligation to consider pollutant parameters not listed in the applicable portion of Table 1, the Court rejects that interpretation. *See Alaska Cmty. Action on Toxics*, 765 F.3d at 1173 ("[W]e generally seek to avoid constructions of a general permit that render certain of its provisions superfluous."). Accordingly, the mere fact that Table 1 does not list the disputed metals does not rebut CAT's evidence of their presence.

Finally, Defendants point to the 2015 General Permit's Fact Sheet, which notes that TSS is one of "three selected minimum parameters . . . considered indicator parameters, regardless of facility type." 2015 General Permit, Fact Sheet at 51. As Defendants note, the Fact Sheet explains that TSS serves as an indicator of "the un-dissolved solids that are present in storm water discharge" because "[m]any pollutants adhere to sediment particles; therefore, reducing sediment will reduce the amount of these pollutants in storm water discharge." *Id.* But the reasons for including a baseline monitoring requirement for all facilities do not erase the general permit's clear command to monitor various "[a]dditional parameters . . . on a facility-specific basis." 2015 General Permit § XI(B)(6)(c); *see also Alaska Cmty. Action on Toxics*, 765 F.3d at 1173.

In sum, Defendants have failed to present any evidence (or legal arguments with merit) rebutting CAT's showing that aluminum, copper, and iron were likely to be present in the Facility's storm water discharges. Accordingly, the Court holds that SDIF's MIP was also deficient from September 8, 2012 until the present because SDIF did not monitor for aluminum, copper, or iron.

### c.     Visual Observation Records

In CAT's motion, it argued that SDIF failed to make monthly visual observations of each drainage area and maintain records of those observations, as required by the General Permit. *See* 2015 General Permit § XI(A)(iii). In Defendants' opposition, they asserted that SDIF "[i]nadvertently . . . did not produce records of its visual observations until February 7, 2019," ECF No. 79 at 28, and attached evidence that they then produced those records to CAT, ECF No. 78-1 ¶ 6; ECF No. 78-5 at 2. CAT's reply did not reassert this claim. CAT's motion on this point is denied.

### 4.    Ongoing Violations

As previously noted, CAT "must prove that ongoing violations actually have occurred" in order for the Court to impose liability for pre-complaint violations. *Sw. Marine*, 236 F.3d at 998 (9th Cir. 2000).

To recap, the Court concludes that disputed factual issues preclude summary judgment on the SWPPP claim as applied to SDIF's 2017 and 2018 SWPPPs. Accordingly, CAT has not yet carried its burden to "prove that ongoing violations actually have occurred." *Id.* Moreover, whether the post-complaint violations are sufficiently related to past violations to be "ongoing [i]s a finding of fact," which the Court cannot yet resolve for similar reasons. *Id.* at 999. But this failure does not deprive the Court of jurisdiction to decide that pre-complaint violations occurred. *See Sierra Club*, 853 F.2d at 671. The Court therefore concludes that the appropriate course is to determinate that pre-suit violations occurred, *see* Fed. R. Civ. P. 56(g), with Defendants' ultimate liability for those violations "conditioned on [CAT's] ability to prove ongoing violations" at a later stage. *Sierra Club*, 853 F.2d at 671.

For the MIP Pollutant claim, the Court concludes that SDIF was in violation for the entire period in question. Defendants point to no relevant change in their monitoring practices or amendments in the 2017 Amended or 2018 MIP. There is thus no basis to distinguish between pre- and post-September 8, 2017 violations. Accordingly, the Court finds that these violations were ongoing.

Finally, as to the MIP Scope claim, the Court also concludes that SDIF was in violation for the entire period. The Court notes that SDIF did not change its underlying sampling practices in the 2017 Amended MIP. Rather, it submitted a representative sampling justification that, if valid, entitles a permittee to sample from fewer discharge locations. 2015 General Permit § XI(C)(4)(a). Because even a valid representative sampling justification would not have authorized SDIF's post-complaint sampling practices, CAT appears to have violated at least some of the same General Permit sampling requirements, *see* 2015 General Permit § XI(B)(4), with the same conduct.

Nonetheless, the Court observes that the parties have not addressed the legal standard that should guide the factual inquiry whether violations are sufficiently related to be found ongoing. A

brief initial review reveals that courts outside of the Ninth Circuit have identified and adopted different approaches. For instance, on remand from the Supreme Court, the Fourth Circuit in *Gwaltney* rejected the argument that "a finding [of] an ongoing violation of the permit" allowed a court to "impose penalties for any past violation of any permit *parameter*." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 698 (4th Cir. 1989). Accordingly, the court could not impose penalties for wholly past discharges of one pollutant based on ongoing discharges of a different pollutant, where the "problems were due to distinct equipment and operational failures, and were corrected by distinct engineering solutions." *Id.*; *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 403 (4th Cir. 2011) (holding that a court lacked jurisdiction over wholly past filing deadline violations based on ongoing effluent limitation violations).

While the Third Circuit likewise rejected a "permit-based" approach under which "jurisdiction attaches to entire cases, not to individual violations alleged within a case," it agreed with the district court that the Fourth Circuit's "by-parameter approach [was] too narrow insofar as it implies that for each violation or set of violations of a parameter, the plaintiff must eventually be able to prove a continuing likelihood that the same exact parameter will be violated." *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 498 (3d Cir. 1993). Accordingly, the Third Circuit adopted a "modified by-parameter approach" that allows a plaintiff to "establish at trial that violations are continuous or intermittent in either of two ways: first, by proving a likelihood of recurring violations of the same parameter; or second, by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters." *Id.* at 499.

The Ninth Circuit does not appear to have expressly addressed the question. In *Natural Resources Defense Council v. Southwest Marine*, the Ninth Circuit affirmed the district court's finding of ongoing violations, concluding that there was sufficient evidence to support its conclusion that a series of incidents violating the SWPPP's "good housekeeping" standard "'present[ed] a picture of overall inadequacies,'" not mere 'snapshots'" of discrete events. 236 F.3d at 999. At least one district court in this circuit has interpreted *Southwest Marine* as applying

1    a modified by-parameter approach similar to the Third Circuit's test.  *Adams v. Teck Cominco*

2    *Alaska, Inc.*, 396 F. Supp. 2d 1095, 1102-03 (D. Alaska 2005).

3        While it appears that the MIP Scope violations are related under even the narrowest "by-

4    parameter" approach, the Court will otherwise leave unaddressed the question whether any post-

5    complaint violations are sufficiently related to past violations to be "ongoing," as well as the

6    appropriate legal standard for making that determination.

7        **D.**    **Civil Penalties**

8        Finally, the Court addresses CAT's request to award civil penalties.  ECF No. 67 at 26.

9            **1.**    **Legal Standard**

10       The CWA provides for civil penalties for each day a violation occurs.  33 U.S.C.

11   § 1319(d).[15]  To determine the appropriate amount of penalties, the CWA instructs a court to

12   "consider the seriousness of the violation or violations, the economic benefit (if any) resulting

13   from the violation, any history of such violations, any good-faith efforts to comply with the

14   applicable requirements, the economic impact of the penalty on the violator, and such other

15   matters as justice may require."  *Id.*  While an award of civil penalties is mandatory, "[d]istrict

16   courts retain the broad discretion to set a penalty commensurate with the defendant's culpability."

17   *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995).

18           **2.**    **Discussion**

19       CAT asserts that, based on the violations alleged above, SDIF has not complied with the

20   applicable General Permit between September 12, 2012, and the present.  ECF No. 67 at 26.

21   Therefore, CAT reasons, every storm water discharge during that period violated the CWA.  *Id.*

22   (citing 33 U.S.C. §§ 1311(a), 1342).  CAT contends that there is no genuine dispute that such

23   discharges occurred on 34 days, and requests that the Court award the applicable maximum

24   penalty for each day, for a total of $1,678,372.  *Id.* at 26-27.

25       The Court declines to determine a penalty amount at this juncture.  First, it would be

26

27   ------------------------------------------------
     [15] As codified, the CWA sets a civil penalty "not to exceed $25,000 per day for each violation."
     33 U.S.C. § 1319(d).  Pursuant to various inflation adjustment statutes, the maximum penalty has
28   increased from $32,500 to $52,414 over the course of this period.  40 C.F.R. § 19.4; *see also* 2015
     General Permit § XX(Q)(1) (providing for maximum penalties permitted under 33 U.S.C. § 1319).

premature to assess the seriousness or history of Defendants' violations, given that CAT did not move for summary judgment on some of its claims and the Court has denied summary judgment as to others. Second, the parties have not presented any evidence or argument relevant to the remaining factors. Finally, the parties have not addressed the basis for holding Schneider Park or either of the individual defendants liable. *Cf. United States v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998) (discussing circumstances under which a "responsible corporate officer" can be held liable under the CWA); *Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1043-44 (N.D. Cal. 2017) (discussing "whether Defendants can be liable under the CWA for storm water discharges associated with industrial activities, when Defendants themselves do not engage in industrial activities but instead own, operate, maintain, and control the Facility which is leased to tenants who engage in such activities").

## CONCLUSION

For the foregoing reasons, the Court GRANTS CAT's motion for summary judgment as to the following points: (1) SDIF did not have an adequate SWPPP from September 12, 2012 through September 7, 2017; (2) SDIF violated the General Permit's requirement to sample from each drainage area from September 12, 2012 until the present; (3) SDIF's failure to monitor for aluminum, copper, and iron violated the General Permit from September 12, 2012 until the present; and (4) SDIF's failure to monitor for aluminum, copper, and iron was an ongoing violation. The Court DENIES summary judgment on the remaining questions of liability and defers consideration of civil penalties pending the resolution of all of CAT's claims.

**IT IS SO ORDERED.**

Dated: March 19, 2019

_____
JON S. TIGAR
United States District Judge